**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1201-20

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

GHERAL ALVAREZ-MERCEDES,

    Defendant-Respondent.

_____

Argued May 10, 2021 – Decided July 13, 2021

Before Judges Currier and Gooden Brown.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 19-06-0062.

William P. Cooper-Daub, Deputy Attorney General, argued the cause for appellant (Gurbir S. Grewal, Attorney General, attorney; William P. Cooper-Daub, of counsel and on the briefs).

Robin Kay Lord argued the cause for respondent.

PER CURIAM

On leave granted, we consider the Law Division's August 21, 2020 order granting defendant's motion to suppress certain evidence. Because we conclude the trial judge misapplied the applicable law to the facts present here, we reverse.

I.

We derive our facts from the evidence elicited during the suppression hearing.

On January 21, 2019, a confidential source informed New Jersey State Police Detectives and agents from the United States Drug Enforcement Agency (DEA) that defendant was engaged in the sale of narcotics and regularly transported drugs from his home in Philadelphia to New Jersey. While the confidential source had never worked with the New Jersey State Police before, he had previously provided information to a different agency that "led to arrests [and] drug seizures[,] as well as a large currency seizure."

On the morning of January 23, 2019, the confidential source spoke with Detective Sergeant First Class Eric Hoffman and other officers at a DEA office. The source informed them that later that day, defendant would drive from Philadelphia to an apartment complex in Maple Shade, New Jersey with a large

quantity of heroin in his vehicle. Hoffman was aware the source had previously worked with a different agency with successful results.

The confidential source specified the make, model, and color of defendant's car—a white Infiniti SUV. He further notified Hoffman that defendant was traveling to the apartment complex to return the heroin to the individual from whom he had purchased it, because defendant "wasn't happy with the quality of the heroin." The confidential source stated he was present at the transaction when defendant originally purchased the drugs, and later "had personal conversations" where defendant expressed his dissatisfaction with the heroin's quality and his desire to return it.

After speaking with the confidential source, Hoffman and other officers searched defendant in the police database. The officers confirmed defendant's identity and learned he had previously been arrested by the DEA for distribution of a controlled dangerous substance (CDS) and conspiracy. The officers learned from the DEA that defendant had attempted to flee during their earlier arrest of him.

As a result of this information, the New Jersey State Police, with assistance from the DEA, set up surveillance at the apartment complex. Sometime after sunset, officers observed a white Infiniti SUV with Pennsylvania

3

license plates pull into the apartment complex. The vehicle circled the apartment complex parking lot several times before parking. Defendant then exited the vehicle carrying a gym bag[1] and walked around the vehicle several times; the surveilling officers described him as "scanning the area [and] looking around." Defendant re-entered the vehicle, drove to a different area of the parking lot, and again got out of the vehicle, this time without the gym bag.

At this point, Hoffman, Detective Ricardo Diaz, and Detective Andrew Oliveira approached defendant and identified themselves as law enforcement. The detectives immediately handcuffed defendant because he started to walk away from them, and they believed he was a flight risk given his earlier attempt to flee when arrested by the DEA. Defendant was read his Miranda[2] rights and the detectives began to question him. As defendant spoke little English, Detective Diaz questioned him in Spanish and acted as a translator when necessary. Hoffman testified during the hearing that defendant was not under arrest at that time, but he was being detained.

---

[1] Hoffman testified the size of the gym bag was consistent with the amount of heroin the confidential source advised defendant would be transporting.

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

4

When Diaz asked defendant what he was doing at the complex, defendant responded that he lived there. However, after the officers asked for identification and the documents indicated defendant lived in Pennsylvania, defendant said he was at the complex to visit a friend. Defendant was unable to provide the detectives with the friend's name or address. Thereafter, defendant said he was there to buy a car. He said he observed from the highway there was a car for sale in the parking lot and he decided to look at it.

The detectives described defendant as "nervous." Detective Oliveira stated defendant was "looking around a lot, looking downwards, not making eye contact . . . [and] shaking . . . ." He also observed a "throbbing" "artery."

Based on defendant's inconsistent responses and nervous demeanor, the detectives asked for consent to search his vehicle. When defendant refused, Hoffman decided to tow the vehicle to the State Police barracks. Hoffman explained he wanted to remove defendant and his vehicle from the area because "there was still an active investigation" at the apartment complex, and he did not want to jeopardize that investigation with a heavy police presence. The detectives searched defendant's person before placing him in the police vehicle and uncovered two cell phones and $3400 in cash.

A-1201-20

After defendant and his vehicle arrived at the barracks, a K-9 unit was dispatched and a dog positively alerted to the presence of narcotics in the vehicle. Detective Oliveira subsequently drafted an application for a warrant to search defendant's vehicle.

The warrant was approved. The subsequent search revealed two clear plastic baggies with blue wax folds of suspected heroin in the center dashboard, $1105 in cash in the center console, and two vacuum sealed bags—one containing heroin and the other containing heroin and fentanyl—in the gym bag.[3] Thereafter, defendant was re-advised of his <u>Miranda</u> rights and arrested.

Defendant was charged in an indictment with: (1) third-degree possession of a CDS, N.J.S.A. 2C:35-10(a)(1); and (2) first-degree possession with intent to distribute a CDS, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(1). He subsequently filed a motion to suppress the evidence obtained from his person and vehicle. Over two days of hearings on the motion, the court heard testimony from Detectives Hoffman, Diaz, and Oliveira.

On August 21, 2020, the court issued an order and written opinion granting defendant's motion to suppress. The court initially found that the

---

[3] In total, officers recovered two kilograms of heroin and seventy-five grams of fentanyl from defendant's vehicle.

information received from the confidential source, defendant's history, and the officers' own observations gave law enforcement reasonable suspicion to believe defendant was engaged in criminal activity. Therefore, the judge found it was "reasonable for the police to temporarily detain . . . defendant pursuant to their ongoing investigation into suspected criminal activity."

However, the judge disagreed with the State's argument regarding probable cause to arrest, and found the officers lacked probable cause to arrest defendant. Relying on State v. Zutic, 155 N.J. 103 (1998), the court concluded that the confidential source's tip was not sufficient to sustain a finding of probable cause. The judge stated, "the officers were only able to corroborate innocent details of the source's tip, such as the time and place . . . defendant would arrive and what vehicle he would be driving." Accordingly, "[w]hile the officers had reasonable suspicion to temporarily detain . . . defendant, the tip alone did not establish probable cause for arrest."

The court also rejected the State's argument that the officers' reasonable suspicion "ripened into probable cause" because defendant carried a gym bag "that could have been used to transport narcotics," he "fidget[ed] and [did] not mak[e] eye contact, and provi[ded] contradictory stories about the reason for his presence at [the apartment complex]." The judge found these factors did not

"amount to corroboration of a suspicious detail . . . necessary to permit an inference that . . . defendant was engaged in criminal activity", and that his "behavior could just as likely be explained by [the] language barrier and . . . being handcuffed."

The judge further disagreed that the $3400 in cash and two cell phones found on defendant supported a finding of probable cause. He held the State could not use this evidence to "retroactively justify the de facto arrest that occurred at the apartment complex sometime between the initial detention and the search that revealed the cash and phone." Because the officers "did not apply for a search warrant until after the dog sniff took place, and did not formally arrest . . . defendant until after the search of the vehicle", the judge found "the officers believed that they lacked probable cause until that point."

Lastly, the court found that defendant's detention "was not reasonably related in scope to the circumstances which justified the initial stop and amounted to an arrest without probable cause." The judge reasoned:

> [D]efendant was detained, in handcuffs, in a parking lot for several hours based solely on the tip of a confidential source. While his temporary detention was justified, the investigation found no other indicia of criminality until . . . defendant and his vehicle were moved, against his will, to the [police barracks].

8

Therefore, the court concluded that defendant "was unlawfully seized and detained and that his car was also unlawfully seized and searched, in what amounted to an arrest and searches without probable cause." The court suppressed the evidence recovered from defendant's person and vehicle.

## II.

We granted the State's motion for leave to appeal. The State contends the court erred in granting defendant's motion to suppress because the totality of the circumstances demonstrate the officers had probable cause to arrest defendant and seize his car. The State only challenges the court's conclusion that the officers lacked probable cause "for any search, arrest or property seizure" before defendant and his vehicle were taken to police barracks.

In our review of a grant or denial of a motion to suppress, we must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record. State v. Elders, 192 N.J. 224, 243 (2007). Deference to factual findings is required because those findings "are substantially influenced by [an] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Gamble, 218 N.J. 412, 425 (2014) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). Appellate courts, therefore, should only reverse when

the trial court's determination is "so clearly mistaken 'that the interests of justice demand intervention and correction.'" Elders, 192 N.J. at 244 (quoting Johnson, 42 N.J. at 162).

A trial court's interpretation of the law, however, and the consequences that flow from established facts are not entitled to any special deference. State v. Gandhi, 201 N.J. 161, 176 (2010); Manalapan Realty, L.P. v. Twp. Comm. of Twp. of Manalapan, 140 N.J. 366, 378 (1995). Thus, a trial court's legal conclusions are reviewed de novo. Gandhi, 201 N.J. at 176.

The State contends the court misapplied established probable cause standards and ignored key factors such as the reliability of the confidential source's tip, the officers' knowledge of defendant's criminal history, and defendant's "suspicious conduct" at the apartment complex. In addition, the State asserts the court's reliance on Zutic was misplaced because it is factually distinguishable from the circumstances presented here.

The Fourth Amendment of the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution protect citizens against unreasonable searches and seizures, and require a showing of probable cause prior to an arrest or the issuance of a warrant. U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7. "The probable-cause requirement is the constitutionally-prescribed standard for

10

distinguishing unreasonable searches from those that can be tolerated in a free society." State v. Novembrino, 105 N.J. 95, 106 (1987). "A warrantless search [or seizure] is presumed invalid unless it falls within one of the recognized exceptions to the warrant requirement." State v. Cooke, 163 N.J. 657, 664 (2000). The State, as the party seeking to validate the warrantless search, "has the burden of proving the validity of the search [or seizure]." State v. Maryland, 167 N.J. 471, 489 (2001).

The standards for determining probable cause to arrest and probable cause to search are identical. State v. Smith, 155 N.J. 83, 92 (1998). Our Supreme Court has stated that the probable cause standard "is not susceptible of precise definition." State v. Moore, 181 N.J. 40, 45 (2004) (citing State v. Wilson, 178 N.J. 7, 13 (2003)). Nevertheless, the Court has consistently held that "a principal component of the probable cause standard 'is a well-grounded suspicion that a crime has been or is being committed.'" Moore, 181 N.J. at 45 (quoting State v. Nishina, 175 N.J. 502, 515 (2003)); see also Maryland v. Pringle, 540 U.S. 366, 371 (2003) (holding that "[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt.").

Probable cause, however, "is not a stringent standard . . . ." State in Int. of J.G., 151 N.J. 565, 591 (1997). It does not require the suspicion that a crime

11

has been or is being committed "be correct or more likely true than false." State v. Johnson, 171 N.J. 192, 207 (2002) (internal citation omitted). Rather, probable cause simply requires "a practical, common-sense decision whether, given all the circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. at 214 (internal quotation marks and citation omitted); see also Florida v. Harris, 568 U.S. 237, 244 (2013).

Given the flexible nature of probable cause, our courts have adopted the totality of the circumstances test set forth by the United States Supreme Court in Illinois v. Gates, 462 U.S. 213, 238 (1983). Moore, 181 N.J. at 46. Among other things, courts are to consider the officers' "experience with specific forms of criminal activity" and observations of events, Novembrino, 105 N.J. at 126, as well as a suspect's criminal record. State v. Jones, 179 N.J. 377, 390-91 (2004).

An informant's tip—though hearsay—may be considered "so long as a substantial basis for crediting [it] is presented.'" Smith, 155 N.J. at 92 (quoting Novembrino, 105 N.J. at 111). Two factors which are "essential" in establishing the credibility of an informant's tip are the "informant's 'veracity' and . . . 'basis of knowledge.'" Id. at 93 (quoting Gates, 462 U.S. at 238). Veracity is

12

established by "demonstrating that the informant proved to be reliable in previous police investigations." State v. Sullivan, 169 N.J. 204, 213 (2001). An informant's basis of knowledge is demonstrated when "the tip itself relates expressly or clearly how the informant knows of the criminal activity." Ibid. (internal citation omitted).

The Sullivan Court stated that because the information in a tip is hearsay, "police corroboration of that information is an essential part of the determination of probable cause." Ibid. (internal quotation marks and citation omitted). The degree of corroboration necessary for a finding of probable cause "depends on a qualitative analysis of 'the unique facts and circumstances presented in each case.'" State v. Keyes, 184 N.J. 541, 556 (2005) (quoting Jones, 179 N.J. at 390). And, although one factor may be insufficient to support probable cause "if considered in isolation," all the factors considered together may "reinforce or augment one another and become sufficient to demonstrate probable cause." Zutic, 155 N.J. at 113 (citing Gates, 462 U.S. at 233).

Here, the trial court found the officers had reasonable suspicion to temporarily detain defendant, but they lacked probable cause to arrest him and seize his vehicle. Although the court considered a number of factors—including "the [confidential source's] tip, . . . defendant's history, and [the officers']

observations" at the apartment complex—it relied almost entirely on Zutic in finding the officers lacked probable cause.

In Zutic, officers received a tip from a confidential informant that the defendant and others had recently purchased drugs at a party and that "they" would be driving on a certain highway in a particular direction; the informant also provided the make, model, and license plate number of the defendant's car. 155 N.J. at 106. The officer "never indicated why he believed the informant was reliable." Ibid. Approximately two hours later, an officer saw a car matching the informant's description and stopped it after its driver, the defendant, made an unsafe lane change. Id. at 106-07. The officer asked the defendant—the car's only occupant—to exit the car after he appeared "very nervous and jittery" and provided an explanation of his whereabouts, which the officer believed was inconsistent with the amount of gas remaining in the defendant's car. Id. at 107.

The defendant was arrested after the officer found drugs on his person and in his car. He subsequently moved in municipal court to suppress the seized evidence. Ibid. The motion was denied, "in part, because 'some of the contraband was found in plain view on the front seat.'" Id. at 108.

Defendant appealed to the Law Division. The trial court affirmed the municipal court's decision, finding "the informant's tip coupled with the sighting

of the vehicle described in the tip was sufficient to establish probable cause to stop and search defendant's vehicle." Id. at 109. We reversed, concluding "the corroborated informant's tip was insufficient to establish probable cause for the search of defendant and his automobile under the Fourth Amendment." State v. Zutic, 294 N.J. Super. 367, 378 (App. Div. 1996).

In its decision, the Court found the State had not established the reliability of the informant's tip. The officer merely asserted the informant was reliable without any basis for his statement. Therefore, a court could not evaluate the informant's credibility or basis of knowledge. Id. at 112-13. Moreover, the informant only provided vague details and "was wrong about a significant piece of information" in advising officers there would be multiple individuals in the car. Id. at 112-13. Therefore, the Court concluded that the "circumstances both singly and in combination [were] insufficient to establish probable cause." Id. at 113.

Here, there are significant factual differences that distinguish these circumstances from Zutic. First, unlike the informant in Zutic, the confidential source here was credible. The officers established the source's veracity by indicating that, although he had not worked with the State Police, he had

previously worked with a different agency and provided information that led to arrests and the seizure of drugs and currency.

In addition, the confidential source's basis of knowledge was established because he was "present for the transaction" where defendant originally purchased the heroin, and later "had personal conversations" where defendant expressed his dissatisfaction with the heroin's quality and his desire to return it. See Keyes, 184 N.J. at 557 (distinguishing Zutic and finding probable cause because officers' affidavit "[did] more than merely state that the tip came from a reliable confidential informant[;] . . . [it] state[d] that the informant has proven himself to be reliable by providing 'information in the past that has resulted in the arrest of numerous suspects and the recovery of proceeds from drug sales.'").

Furthermore, the confidential source here provided the officers with accurate information. The source gave law enforcement defendant's name and predicted he would drive from his home in Philadelphia to the apartment complex in a white Infiniti SUV.

There are additional facts in the record supporting a finding of probable cause that were absent in Zutic. Each of the detectives involved in defendant's arrest possessed significant experience investigating and prosecuting narcotics

offenses.[4]   Moreover, through researching defendant and consulting with the DEA, the detectives learned about defendant's criminal history, which included recent charges for distribution of a CDS and conspiracy.  While these facts alone do not constitute probable cause, they are properly considered in the totality of the circumstances inquiry.  Jones, 179 N.J. at 390-91; Novembrino, 105 N.J. at 126.

The detectives' observations of and interactions with defendant at the complex also contributed to probable cause.  The detectives observed defendant, in the vehicle described by the confidential source, arrive at the complex and exit his vehicle with a gym bag.  The detectives stated the size of the bag was consistent with the amount of heroin the source advised defendant would be transporting.  The detectives further testified that defendant "scan[ed] the area" before re-entering his vehicle, driving to another area of the parking lot, and exiting without the gym bag.

At this point, the detectives approached defendant and immediately put him in handcuffs.  They explained that they took this action because of the

---

[4] Detective Hoffman testified that he had been a police officer for over sixteen years and made "several hundred[]" narcotics arrests; Detective Diaz testified he had been a police officer for over fourteen years, eleven of which were spent in narcotics; Detective Oliveira testified that he had been a police officer for six years and had made between fifty and one hundred narcotics arrests.

information received from the DEA that defendant attempted to flee when it arrested him.

Defendant also gave contradictory answers to the officers' questions. When asked why he was at the complex, defendant initially stated he lived there; however, after the officers noted his driver's license had a Philadelphia address, defendant stated he was visiting a friend. When he was unable to provide the friend's name or address, defendant again changed his story. He claimed he pulled off the highway and drove into the complex after seeing a "for sale" sign on a parked car in the complex's parking lot. During this exchange, the officers observed defendant's "artery" "throbbing" and noticed him exhibit other signs of nervousness, including "looking around a lot, looking downwards, not making eye contact . . . [and] shaking . . . ."

While alone one of these behavioral factors might not demonstrate probable cause, when combined with all of the information, including the accuracy of the informant's tip, we are satisfied that, under the totality of the circumstances, they "reinforce . . . one another and become sufficient to demonstrate probable cause." Zutic, 155 N.J. at 113 (citing Gates, 462 U.S. at 233). As stated, probable cause only requires "a fair probability" of criminality. Johnson, 171 N.J. at 214.

As stated, we defer to the trial judge's factual findings. However, given the totality of the circumstances—including the confidential source's credibility, the detectives' experience and observations, and defendant's criminal history—we conclude there was sufficient support for a finding of probable cause to arrest defendant and seize his vehicle. Therefore, we reverse the trial court's August 21, 2020 order granting defendant's motion to suppress.

Reversed and remanded for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

19

A-1201-20